UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHGIAN
NORTHERN DIVISION

_____

JOSHUA STANHOPE,

                                                    Case No. 2:25-CV-_____

                                                    Hon.

      Plaintiff,

v.

LAKE SUPERIOR STATE UNIVERSITY,
ANYA ALEXANDER, and MICHAEL
BEAZLEY,

      Defendants.

_____

## COMPLAINT AND JURY DEMAND

_____

### Complaint

Plaintiff Joshua Stanhope, by and through his attorneys, Pinsky Smith, PC, states as follows:

### Jurisdiction, Venue, and Parties

1.      This is an action requesting the Court to remedy violations of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws 37.2101 *et seq.*

2.      The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

3.      Plaintiff is a resident of the State of Maine.

4.      Defendant Lake Superior State University ("LSSU") is a public university located within Chippewa County in the State of Michigan, which does business in the Western District of Michigan, Northern Division.

5.      Defendant Anya Alexander is a Black female and the Associate Dean of Student Affairs and Executive Director of Campus Life & Engagement at LSSU. She works within Chippewa County, Michigan. Upon information and belief, Defendant Alexander is domiciled within Michigan.

6.      Defendant Michael Beazley is a white male and the Dean of Students at LSSU. He works within Chippewa County, Michigan. Upon information and belief, Defendant Beazley is domiciled within Michigan.

7.      Plaintiff is a white male.

8.      The amount in controversy in this matter exceeds $75,000, exclusive of attorney fees, costs, and interest.

9.      The acts that are the subject of this action occurred in Chippewa County, Michigan.

10.      Venue is proper within this judicial district under 28 U.S.C. § 1391(b).

FACTUAL ALLEGATIONS

11.      LSSU employed Plaintiff from August 1, 2023 until July 1, 2024 as the Director of Housing and Residence Life. Defendant Alexander supervised Plaintiff for the entire time he worked for LSSU. However, on or about May 24, 2024, LSSU made Defendant Beazley Plaintiff's direct supervisor instead of Alexander, but in

name only. Defendant Alexander continued her day-to-day supervision of Plaintiff until Defendant Beazley terminated Plaintiff's employment on July 1, 2024.

12.    Defendant Alexander recruited Plaintiff and his wife to sell and leave their home in Maine, and move with their small children to Sault Ste. Marie, Michigan, for Plaintiff to take the job as LSSU Director of Residence Life. The job required Plaintiff and his family to live on campus in LSSU housing. Plaintiff and his wife specifically discussed with Defendant Alexander that they were concerned about the risk of uprooting their family and home, and moving across the country to a new and remote community for the LSSU position. But Defendant Alexander assured them that this was a long-term opportunity for Plaintiff.

13.    Almost immediately, Plaintiff discovered that Defendant Alexander was an extremely toxic supervisor.

14.    After Plaintiff began employment at LSSU, he learned that Defendant Alexander had been fired from her prior employment at a private Christian college in the Western United States. When Defendant Alexander obtained her position at LSSU, she brought Kathryn Evans, a friend and colleague of hers from the same college, to take an LSSU position as a Residence Hall Coordinator. In her role as a Residence Hall Coordinator, Ms. Evans was directly supervised by Plaintiff.

15.    Defendant Alexander and Ms. Evans are close personal friends and spent time outside the office socializing together. Staff from LSSU Human Resources ("HR") told Plaintiff that Defendant Alexander was coaching and encouraging Ms. Evans to ignore Plaintiff's directives and to undermine him and his

work generally. Resident Advisors ("RAs") that Ms. Evans supervised also reported to Plaintiff that Ms. Evans told them to ignore Plaintiff's directives because that is what she did.

16.    Defendant Alexander often criticized Plaintiff and took the position that Plaintiff intended to undermine her when Plaintiff did not copy Defendant Alexander on his emails to other university officials. Conversely, Defendant Alexander also complained if she was copied what she considered to be too often on emails to other university officials. Defendant Alexander was also unhappy when she felt that Plaintiff was making social connections in the community, as if that too would undermine her.

17.    Plaintiff had hours and hours of conversations with Defendant Alexander about how he could better support her in her view, and to address her oft-repeated complaints. This resulted in him spending far more than 40 hours per week doing work – sometimes up to 80 hours per week. However, Defendant Alexander's constant rehashing of her grievances did not result in her providing specific complaints or any concrete actions that Plaintiff could undertake or do differently. There was no pleasing Defendant Alexander.

18.    Defendant Alexander initiated a three-month employee review/write-up of Plaintiff, alleging that Plaintiff had poor communication skills. When HR personnel delivered the review to Plaintiff, they assured Plaintiff that they understood the impossibility in pleasing Defendant Alexander. They also told

Plaintiff that under LSSU's employee policies, a review like this after three months

could not be used against Plaintiff as a basis for further discipline.

19.    Yvonne Brown from LSSU's HR told Plaintiff that HR was aware of

Defendant Alexander's extreme problems in management and that Defendant

Alexander "had a problem with men" particularly.

20.    Defendant Alexander often acknowledged and admitted that she knew

she was managing Plaintiff in an abusive manner, but that she still intended to

continue doing so. On one occasion, she said, "I'm feeling really stressed, I'm

overwhelmed, I know I shouldn't treat you this way."

21.    Defendant Alexander kept control of the housing department budget,

yet tried to blame Plaintiff for a troubling deficit in that department when reporting

to other LSSU leaders. Defendant Alexander blamed Plaintiff to others despite

refusing to turn over any control over the budget to him. What had been spent by

Plaintiff's predecessor was not accounted for correctly when the department created

the budget for the calendar year 2024, and the housing department was poised to

quickly go into a deficit. Defendant Alexander wasn't truthful with the Board of

Trustees about the status of the budget deficit, and then began to tell upper

administration and the Board that Plaintiff was responsible for the deficit, when

that assertion was not true.

22.    During her repeated acknowledgement that she was treating Plaintiff

poorly, Defendant Alexander seemed to view her ability to do so as a management

prerogative. She once said, "I'm not going to stop; I'm going to treat you how I want to treat you."

23.    On or about May 14, 2024, when having a conversation where Defendant Alexander was complaining to Plaintiff about "white men" in the local community, she asserted to Plaintiff that he would obtain whatever he wanted because of his race and sex as a white man. Defendant Alexander also told Plaintiff that he was required to use a "safe word" when he felt he could not tolerate her treatment any more, and therefore required protection from her abuse of him in her management.

24.    While Plaintiff understands that he benefits from privilege in society as a white male, Defendant Alexander's comments went far beyond a mere recognition of that concept. Defendant Alexander's persistent behavior in her management of Plaintiff was designed to undermine and humiliate him in particular, and to make it impossible for him to satisfactorily complete his work. The addition of her "safe word" and assertion that Plaintiff would obtain whatever he wanted because of his race and sex were the culmination of the discriminatory hostile working environment that Defendant Alexander created, with the acquiescence of LSSU.

25.    At this point, although Plaintiff had communicated with LSSU HR personnel on various occasions about the extremely difficult working environment under Defendant Alexander, Plaintiff made a report of discrimination to HR about Defendant Alexander's remarks. Plaintiff noted that his status as a white male

could explain Defendant Alexander's particular supervisory abuse of him. HR

personnel acknowledged that Defendant Alexander had created a hostile work

environment for Plaintiff when she forced him to use a "safe word" to protect him

from her abuse. About 10 days later, LSSU reassigned Defendant Beazley to be

Plaintiff's official direct supervisor.

26.    Plaintiff disclosed to Dr. Beazley that his wife was pregnant, and that

the stress that Plaintiff's job placed on him had extended to his wife and that

Plaintiff was concerned about possible negative effects on her pregnancy.

27.    Although Defendant Beazley was ostensibly the supervisor during the

last period of Plaintiff's employment, Defendant Beazley did not take any

meaningful action to supervise the department. The change in official supervisor

turned out to be one in name only. All day-to-day supervision and operations were

still conducted by Defendant Alexander, so the discriminatory working environment

persisted and was even worse after Plaintiff's report.

28.    HR personnel determined that LSSU needed to terminate the

employment of either Plaintiff or Defendant Alexander because of the tension and

toxicity of the working environment in the housing department. In particular,

Plaintiff's report of discrimination, which resulted in LSSU's response to make

Defendant Beazley Plaintiff's official supervisor (in name only), enraged Defendant

Alexander. HR decided that LSSU should fire Plaintiff to attempt to resolve the

problem, despite having acknowledged multiple times that Plaintiff was not the

problematic employee and that Defendant Alexander was. HR personnel had these

conversations in front of student employees. Student employees also often heard HR personnel describing other matters about Plaintiff which should have remained confidential, like the stress that Plaintiff reported that the discriminatory working environment was putting his family under.

29.    Defendant Beazley notified Plaintiff on July 1, 2024 that LSSU was terminating his employment. Defendant Beazley blamed the termination on Plaintiff's alleged "communication" and his negative three-month review/write-up that HR personnel had specifically told Plaintiff would not be used against him under LSSU's policies.

30.    Defendant Beazley's reasons for termination of Plaintiff's employment were false and mere pretext for discrimination based at least in part on Plaintiff's race and/or sex. Upon information and belief, HR determined it was preferable to fire Plaintiff instead of Defendant Alexander based at least in part on Plaintiff's race and sex compared to Defendant Alexander's.

31.    Defendant Beazley gave Plaintiff and his family until the end of the month, July 31, 2024, to vacate their campus residence and move elsewhere. Having sold their home in Maine, and not knowing where he would find replacement employment, Plaintiff and his family – his two young children and his wife in her third trimester of pregnancy – were forced to move to a temporary residence in their prior community in Maine.

32.     Three RAs who worked for Plaintiff complained to the LSSU President about Plaintiff's termination – and then Defendant Beazley fired them, too, in retaliation for their complaints.

33.     Three other RAs filed a formal complaint about Defendant Alexander's poor leadership, and met with Dr. Beazley and Kate Bergel, LSSU's HR Director, to provide further information. Eventually, all three resigned in frustration when Dr. Beazley continued to do nothing.

34.     When Plaintiff provided a rebuttal to Defendant Beazley's termination of him, Beazley claimed not to know that LSSU policy was that the three-month write-up could not be used against Plaintiff in giving discipline because the write-up violated LSSU's standards.

## COUNT I – VIOLATION OF ELCRA – RETALIATION FOR REPORTING UNLAWFUL DISCRIMINATION PROHIBITED BY ELCRA

35.     Plaintiff relies on all prior allegations as if restated herein.

36.     Plaintiff made a report of discrimination on the basis of race and/or sex, which is otherwise prohibited by ELCRA, by Defendant Alexander to Defendants' HR employees.

37.     Defendants' decision to fire Plaintiff was based at least in part on retaliation for Plaintiff's report of discrimination prohibited by ELCRA.

38.     Said retaliation is also prohibited by ELCRA.

39.     As a result of Defendants' termination of Plaintiff in violation of ELCRA, Defendants are liable to Plaintiff for damages in an amount exceeding $75,000, including lost wages and benefits; future lost wages and benefits; compensatory

9

damages for emotional and mental distress; and punitive damages, as well as additional attorney fees and costs.

WHEREFORE, Plaintiff requests that the Court grant him relief in an amount as determined by a jury, including reasonable attorney's fees and costs, plus interest and costs, pursuant to ELCRA.

## COUNT II – VIOLATION OF ELCRA – DISCRIMINATION AND HOSTILE WORK ENVIRONMENT ON THE BASIS OF RACE AND/OR SEX PROHIBITED BY ELCRA

40.     Plaintiff relies on all prior allegations as if restated herein.

41.     Plaintiff suffered a hostile work environment in his employment with Defendants based at least in part on his race and/or sex. HR personnel acknowledged this on or about May 14, 2024 after Plaintiff reported discrimination.

42.     Defendants fired Plaintiff from his employment, instead of disciplining or firing Defendant Alexander for her wrongful conduct, at least in part based on Plaintiff's race and/or sex.

43.     As a result of Defendants' termination of Plaintiff in violation of ELCRA, Defendants are liable to Plaintiff for damages in an amount exceeding $75,000, including lost wages and benefits; future lost wages and benefits; compensatory damages for emotional and mental distress; and punitive damages, as well as additional attorney fees and costs.

WHEREFORE, Plaintiff requests that the Court grant him relief in an amount as determined by a jury, including reasonable attorney's fees and costs, plus interest and costs, pursuant to ELCRA.

10

PINSKY SMITH, PC
Attorneys for Plaintiff


Dated: February 3, 2025          By:    /s/ Sarah R. Howard
                                       Sarah Riley Howard
                                       146 Monroe Center St NW, Suite 418
                                       Grand Rapids, MI 49503
                                       (616) 451-8496
                                       showard@pinskysmith.com




## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth

above, Plaintiff hereby demands same.



PINSKY SMITH, PC
Attorneys for Plaintiff


Dated: February 3, 2025          By:    /s/ Sarah R. Howard
                                       Sarah Riley Howard
                                       146 Monroe Center St NW, Suite 418
                                       Grand Rapids, MI 49503
                                       (616) 451-8496
                                       showard@pinskysmith.com

11